Peter Bibring (SBN 223981)
  pbibring@aclu-sc.org
ACLU FOUNDATION OF
  SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017
Telephone:  (213) 977-9500
Facsimile:   (213) 977-5297


L. Rachel Lerman (SBN 193080)
  rlerman@akingump.com
Felix Lebron (SBN 232984)
  flebron@akingump.com
Sarah Gettings (SBN 260436)
  sgettings@akingump.com
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone:  (310) 229-1020
Facsimile:   (310) 229-1001

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SHAWN NEE; GREGGORY MOORE;
SHANE QUENTIN; and THE
NATIONAL PHOTOGRAPHERS'
RIGHTS ORGANIZATION,

        Plaintiffs,

        v.

COUNTY OF LOS ANGELES; LOS
ANGELES COUNTY SHERIFF'S
DEPARTMENT; SERGEANT
MAURICE HILL, in his individual
capacity; DEPUTY RICHARD
GYLFIE, in his individual capacity;
DEPUTY BAYES, in his individual
capacity; and DOES 1 through 10,
inclusive,

        Defendants.

CASE NO.: CV11- 08899 DDP (JGx)

**COMPLAINT FOR INJUNCTIVE,
RELIEF, DECLARATORY
RELIEF, AND DAMAGES.**

JURY TRIAL DEMANDED

**JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (in that they arise under the Constitution of the United States), § 1343(a)(3) (in that they are brought to redress deprivations, under color of state authority, of rights, privileges, and immunities secured by the United States Constitution), § 1343(a)(4) (in that they seek to secure equitable relief under 42 U.S.C. § 1983), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

2.     Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

3.     This Court has the authority to grant damages, declaratory and injunctive relief, and any other appropriate relief pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1343; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

**INTRODUCTION**[1]

4.     Photography is not a crime; it is a means of artistic expression.  In public spaces, on public streets and from public sidewalks, no law bars Los Angeles residents and visitors from photographing the world around them, from documenting their own lives or using their lenses to find the sublime in the commonplace.

5.     The Los Angeles Sheriff's Department ("LASD") has taken a different, and erroneous, view of photography.   LASD deputies have repeatedly subjected the three Plaintiffs in this action, and others, to detention, search, and interrogation simply because they took pictures from public streets.  LASD deputies have also ordered some Plaintiffs, and others, not to photograph at all

---

[1]  The allegations of this complaint are based on information and belief, unless otherwise specified.

1

1  from public places where photography is not prohibited.  These acts plainly violate

2  Plaintiffs' First Amendment right to free expression and their Fourth Amendment

3  right to be free of unjustified searches and seizures.

4      6.      For as long as human society has existed, we have turned our creative

5  attentions to exploring not only the fantastic and the grand, but also daily life

6  around us.  From early cave paintings that depict hunting and farming, scenes of

7  peasant life in illustrated manuscripts, the "genre painting" works of 17th Century

8  Dutch and Flemish painters, the Impressionists such as Monet who broke with the

9  establishment's preference for pastoral landscapes or classical themes in favor of

10  the industrial scenes or depictions of workers and artists, to 20th century American

11  artists like Edward Hopper (who painted city life in works like *Nighthawks*) –

12  painters have captured beauty and humanity in everyday subjects.

13      7.      Photographers, too, have used their talents and skills to mine daily life

14  for their art.  Through its Artists Project, the Works Progress Administration in the

15  1930s sent photographers forth to document America and the WPA, a mission that

16  guided photographers like Dorothea Lange and Walker Evans into careers that

17  blended documentary and artistic styles and shaped art photography for decades to

18  come.  Some of the 20th century's best-known photographers captured urban street

19  life, transit, and industrial scenes: photographs of the New York subways by

20  Walker Evans, Bruce Davidson, and William Claxton,[2] trains and stations by

21  O. Winston Link,[3] industrial equipment by Bernd and Hilda Becher,[4] images of

22

23  [2] *See, e.g.*, Bruce Davidson and Arthur Ollman, SUBWAY (Aperture 1986); Walker
    Evans, MANY ARE CALLED (Houghton Mifflin 1966); Charles Hagen, *What Walker*
24  *Evans Saw on His Subway Rides*, N.Y. Times (Dec. 31, 1991), available at
    http://www.nytimes.com/1991/12/31/ arts/review-photography-what-walker-evans-
25  saw-on-his-subway-rides.html.
26  [3] *See generally* Website of the Link Museum at http://www.linkmuseum.org.
27  [4] *See, e.g.*, Blake Stimson, *The Photographic Comportment of Bernd and Hilla*
    *Becher*, Tate Papers (Tate Museum 2004), available at http://www.tate.org.uk/
28  (cont'd)

urban New York in Jacob Riis's *How The Other Half Lives*[5] and Andy Warhol's *Street Diaries*,[6] or the romance of the Paris street in Robert Doisneau's iconic *Le Baiser De L'Hôtel De Ville*.[7]

8.     With digital cameras now inexpensive and ubiquitous, and capable of taking thousands of photographs with no developing costs, photography today is no longer practiced only by dedicated artists and professionals, but has become a widely used mode of expression.  One photo-sharing website, Flickr, reportedly stored 5 billion photos as of September 2010, while, at the time, social-networking site Facebook reported its users uploaded half that number (2.5 billion) every month.[8]

9.     Plaintiffs also photograph the world around them.  But LASD deputies detained and searched Plaintiff Shawn Nee for photographing turnstiles on the Los Angeles Metro, asking if he planned to sell the photos to Al Qaeda and threatening to put his name on the FBI's "hit list."  LASD deputies detained and searched Plaintiff Moore while he was photographing drivers for a news story, accusing him of "suspicious activity."  LASD deputies detained and searched Plaintiff Quentin while he was photographing the brilliantly lit refineries in South Los Angeles at night, placing him in the back of a squad car for about forty-five

---

research/tateresearch/tatepapers/04spring/stimson_paper.htm.

[5] Jacob A. Riis, *How the Other Half Lives: Studies Among the Tenements of New York*, (Charles Scribner's Sons 1890).

[6] *See* Jonas Mekas, *Andy Warhol's Street Diary: Photographs 1981-86,'* essay from exhibition catalog (Deborah Bell Photographs 2010), available at http://jonasmekasfilms.com/diary/?p=687.

[7] *See, e.g. Classic Kiss Shot Sold at Auction*, B.B.C. News (Apr. 25, 2005) (reporting on the 2005 sale of an original print for 155,000 Euros), available at http://news.bbc.co.uk/2/hi/ entertainment/4481789.stm.

[8] John D. Sutter, *5 billionth photo uploaded to Flickr*, CNN (Sept. 20, 2010), available at http://articles.cnn.com/2010-09-20/tech/flickr.5.billion_1_photo-sharing-site-flickr-facebook.

1  minutes before releasing him.  On separate occasions, LASD deputies have ordered

2  Nee and Quentin not to photograph from public sidewalks.  And others besides

3  plaintiffs have suffered similar treatment at the hands of LASD.

4     10.    The LASD's policy and practices of targeting photographers did not

5  develop spontaneously.  Over the past several years, law enforcement agencies

6  across the country have implemented "suspicious activity reporting" programs,

7  under which officers are trained to report certain categories of behavior believed to

8  be potential indicators of terrorism.  Many departments include photography as one

9  such "suspicious activity" that should be reported.  LASD's policy and practice of

10  subjecting photographers to search and detention, and of ordering people not to

11  photograph in public places where photography is generally allowed, results from a

12  deliberate extension of, or improper training on, these "suspicious activity

13  reporting" programs.

14     11.    In the face of the long tradition of photographic art, and the wide

15  embrace of photography today, LASD's custom and practice of detaining,

16  searching, and interrogating people simply for lawfully taking photographs in

17  public not only violates the First and Fourth Amendment, but it also serves no

18  legitimate purpose.  LASD's custom and practice of allowing its officers to

19  prohibit photography that is perfectly lawful violates the First Amendment and

20  does not make the public safer.

21     12.    By this action, Plaintiffs seek to put an end to LASD harassment of

22  photographers and to obtain a ruling from this Court that photography alone cannot

23  be a basis for criminal suspicion, detention and search.

24                                    **PARTIES**

25     13.    Plaintiff Shawn Nee is a Los Angeles-based award-winning

26  photographer and aspiring professional photojournalist.  His primary interests are

27  in documentary photography, particularly in capturing poverty and street life in the

28  Hollywood area, as well as other images of urban public life.  Much of Nee's work

focuses on street photographs of various Hollywood communities, but he also photographs in downtown Los Angeles, including capturing the homeless in Los Angeles' skid row.  His photography has appeared on NBC, National Public Radio, The New Yorker, The Atlantic, the Stranger, LAist.com, and The Advocate, and has been exhibited at various galleries in Los Angeles.  Nee is a founder and member of the National Photographers' Rights Organization.

14.     Plaintiff Greggory Moore is a reporter from Long Beach, California, who works for the <u>Long Beach Post</u>.  Moore does not consider himself a serious photographer, but he is generally required to take any photographs that run alongside his stories.  Due to the nature of his job and news coverage, Moore intends to continue taking pictures of newsworthy events, including pictures of public facilities in the Los Angeles area, including courthouses, subways, and other public buildings.

15.     Plaintiff Shane Quentin is an art photographer and part-time freelance photographer based in Los Angeles, California.  Quentin received a B.F.A. in Sculpture/New Genres from OTIS College of Art and Design, and an M.F.A. in Studio Art from U.C. Irvine, where he focused primarily on photography and video work.  His photographs have been exhibited at art galleries in Los Angeles. Quentin also sells photographs commercially through stock photography services. Quentin's interests include photographing industrial areas, often at night, and Quentin's commercial photography primarily involves industrial subjects.

16.     Plaintiff National Photographers' Rights Organization ("NPRO") is an advocacy organization founded to educate photographers about their rights and to support photographers who have been wrongfully detained in the course of taking photographs or prevented from taking photographs in public places.  The group has a membership of several hundred nationwide, including about thirty in Los Angeles, and has conducted events and actions aimed at educating photographers and law enforcement about photographers' rights.

17.     Defendant County of Los Angeles ("the County") is a county of the State of California duly organized under the laws of the State of California. Defendant County is charged by law with the administration and operation of LASD and charged with the employment, control, supervision, discipline, training and practices of its personnel and employees and with the formulation of its policies, practices, and customs of its personnel and its employees.

18.     Defendant LASD is a municipal corporation that provides law enforcement services within the County.  As part of its mandate, LASD polices the Los Angeles County Metro Rail ("Metro Rail"), the rapid transit rail system serving Los Angeles County, via contract with the Los Angeles County Metropolitan Transportation Authority ("MTA").  LASD is responsible for the assignment, training, supervision and discipline of deputy sheriffs assigned to the Metro Rail, just as they are for any other deputy sheriff within LASD.

19.     Defendant Richard Gylfie is, and at all times material herein was, a duly appointed deputy and agent of Defendants LASD and the County, acting within the scope of his employment with LASD and the County and under color of state law.  Deputy Gylfie is sued in his individual capacity.

20.     Defendant Officer Bayes is, and at all times material herein was, a duly appointed deputy and agent of Defendants LASD and the County, acting within the scope of his employment with LASD and the County and under color of state law.  Deputy Bayes is sued in his individual capacity.

21.     Defendant Maurice Hill is, and at all times material herein was, a duly appointed sergeant and agent of Defendants LASD and County, acting within the scope of his employment with LASD and the County and under color of state law. Sergeant Hill is sued in his individual capacity.

22.     The true names and capacities of Defendants sued as Does 1 through 30 are unknown to Plaintiffs who therefore sue these Defendants by fictitious names.  Doe Defendants include the supervisors at LASD and County who directly

1  approved the acts, policies and training described herein, as well as agents,

2  officers, and employees of LASD and County who are liable in connection with

3  one or more of the claims sued upon here and are responsible in some manner for

4  the wrongful acts and conduct alleged herein.  Plaintiffs will amend this Complaint

5  to show Doe Defendants' true names and capacities when they have been

6  ascertained.  Plaintiffs are informed and believe, and herein allege, that such Doe

7  Defendants are residents of California.

8  ## FACTUAL ALLEGATIONS

9  **I.    First Incident: Defendants' Unlawful Detention of Nee on the LA Metro**

10      23.    On the afternoon of Saturday, October 31, 2009, Nee bought a valid

11  ticket for the Metro Rail in order to ride home after a day of photographing.

12      24.    When Nee arrived at his stop at the Hollywood and Western Metro

13  Rail station, he got off the train.  He then walked toward the turnstiles and stopped

14  just inside the exit to examine the newly installed turnstiles.  Nee was aware that

15  the new turnstile machines were highly controversial and the subject of contentious

16  debate in Los Angeles.  Nee decided to snap a few quick photographs before he

17  left the station.

18      25.    As Nee was photographing the turnstiles, Defendants LASD Deputies

19  Gylfie and Bayes approached him and asked why he was taking pictures.[9]  Nee

20  asked Gylfie if he was being detained. Gylfie responded that Nee was being

21  detained because Gylfie wanted to know why Nee was taking pictures in the

22  subway.

23      26.    When Nee protested that he wasn't doing anything wrong, Gylfie told

24  Nee that the subway station was a terrorist target, and that MTA rules prohibit

25  photography.

26  _____

27  [9]  Nee captured the events on video, which he subsequently posted at
http://www.youtube.com/watch?v=yY2cCPW3H7g.

28

7

27.     When Nee again protested that MTA rules did not prohibit photography, Gylfie asked for his identification and told him: "I want to know who you are, and I want to know why you're taking pictures of the subway system. Al Qaeda would love to buy your pictures, so I want to know if you are in cahoots with Al Qaeda to sell these pictures to them for terrorist purposes. That's, that's a crime. You understand?" When Nee again said he was committing no crime, Gylfie told Nee he was "being detained until I have determined that you have not committed a crime."

28.     When Nee continued to protest his innocence of any wrongdoing, Gylfie said, "maybe I should just arrest you." He then grabbed Nee and pushed him up to a nearby wall and ordered him to put his hands behind his back, interlace his fingers, and spread his legs. Gylfie then held Nee's hands behind his back while he patted Nee down and searched through his pockets. Defendant Bayes witnessed and participated in the incident and assisted in Nee's detention. Gylfie neither asked for, nor received, Nee's consent to conduct the search.

29.     During the search, Gylfie removed the contents of Nee's back left pocket (including his money, identification, phone, marker and various papers and receipts) and placed them on the ground. Gylfie and Bayes then scanned Nee's driver's license to conduct a warrant check.

30.     Gylfie continued to question Nee, telling him, "I want to determine whether you're committing a crime or not. If you're down here taking pictures and selling them to Al Qaeda so they can blow up our subway system, I've got a problem with that. That's a crime. Is that clear to you or not? … For the safety of the public, riding the trains." Gylfie then proceeded to lecture Nee about worldwide terrorist attacks.

31.     Several minutes into the detention, Nee informed Gylfie that he was exercising his right to remain silent. In response, Gylfie told him, "You know, I'll just submit your name to T.L.O. [terrorism liaison officer]. Every time your

8

1  driver's license gets scanned, every time you take a plane, any time you go on any
2  type of public transit system where they look at your identification, you're going to
3  be stopped.  You will be detained.  You'll be searched.  You will be on the F.B.I.'s
4  hit list.  Is that what you want?  … Every time you move, you will be stopped and
5  detained and searched.  And delayed."

6      32.    Gylfie then again asked Nee what he was taking pictures of.  As Nee
7  remained silent, Gylfie continued: "Okay, so you're taking pictures of the
8  infrastructure of the subway system, possibly to, uh, plant a bomb or something?"
9  Gylfie told Nee that his silence raised more suspicion and again said that he would
10  put Nee's name on "the hit list."

11      33.    Gylfie's and Bayes' unlawful and unreasonable detention,
12  interrogation, and search of Nee continued for nearly 30 minutes, during which
13  time Deputies Gylfie and Bayes made clear to Nee that he was not free to leave.
14  Gylfie and Bayes released Nee without issuing a citation and told him to leave the
15  Metro Rail Station.

16      34.    Nee subsequently filed a complaint with LASD, providing them with
17  a link to the video footage.  On about June 13, 2011, Nee received a letter signed
18  by Capt. Daniel S. Cruz, of LASD's Transit Services North Bureau, about his
19  complaint, which stated, "Based on thorough investigation by Internal Affairs and
20  a review of the audio and video of the incident, they determined that the deputy did
21  not violate any department policies."

22      35.    The Metro "Photography Guidelines" listed on the MTA website
23  provide that photography within the Metro Rail system is permitted with limited
24  exceptions.[10]  So long as the photography is not for commercial purposes, no
25

26  [10]   The Metro photography guidelines are available at
27  http://www.metro.net/about/filming-metro/metro-filming-photography-guidelines/.
   In addition to the posted guidelines, the MTA has clarified no permit is necessary
28  (cont'd)

1  permit is required if the photographic equipment is hand held, no tripods or flash

2  are used, and the images are not taken inside moving trains.  Nee complied with all

3  of these limitations, and was not taking these photographs for commercial

4  purposes.  Nee followed MTA rules and was otherwise engaged in lawful,

5  protected activity when Gylfie and Bayes detained him and accused him of

6  conspiring with terrorists.

7    36.    As a result of his unlawful and unreasonable detention, Nee now

8  experiences extreme anxiety over riding the Metro Rail and photographing on

9  MTA property and seldom rides the subway anymore.

10  **II.    Second Incident: Defendants Unlawfully Prevented Nee From**

11        **Photographing on Hollywood Boulevard**

12    37.    On Sunday, May 1, 2011, Nee was photographing people walking on

13  the street along Hollywood Boulevard in Hollywood, California, as part of a long-

14  running project to build a book of photographs on the street life of Hollywood.

15    38.    While he was photographing, Nee became aware of a commotion on

16  Hollywood near Vine, in front of the entrance to the Hollywood / Vine Metro

17  Station that is in the base of the W Hotel. Nee approached and saw four to five

18  LASD cars and an ambulance pulled over on the street.  About ten officers huddled

19  around the cars, including a senior officer who was videotaping the scene.  The

20  incident attracted a number of curious observers, many of whom stopped on the

21  sidewalk as they walked down Hollywood Boulevard.

22    39.    Nee began to take pictures of the scene from the public sidewalk in

23  front of the W Hotel and Metro entrance.  The sidewalk where Nee stood is wide

24  compared with many in the area, and, as part of the Hollywood Star Walk, is a

25  tourist attraction in its own right.  Nee was standing on the Hollywood Star Walk

26

27

28  to take photographs for noncommercial purposes.

1   while he photographed, near the star for Shania Twain.  Nee photographed while

2   some pedestrians walked past and others stood looking at the incident.  The

3   deputies had not closed the sidewalk, nor were Nee or other onlookers blocking the

4   free passage of pedestrians.

5          40.     Shortly after he began photographing, an LASD deputy approached

6   Nee.[11]   The deputy told Nee that he was standing "between the W [Hotel] building

7   and MTA property" and that "they don't allow any photography between the W

8   building and MTA property."  The deputy also told him that a person at the scene

9   was receiving medical treatment and could sue Nee if Nee took his picture.  The

10  deputy told Nee that if he wanted to take photographs, he would ask Nee to move

11  from his current location to the other side of the W Hotel, nearly half a block away.

12         41.     Nee protested that he was not doing anything unlawful, and asked if

13  the sidewalk was still open, to which the deputy said that public access was

14  limited.  Nee asked the deputy if he could merely stand and take photographs

15  where other individuals were standing watching the scene, but the deputy told him

16  he could not and again directed Nee to relocate behind the W Hotel, indicating that

17  he was giving Nee a "lawful order."  During this exchange, Nee asked to speak to a

18  supervisor, and the deputy responded that it was his supervisor who had instructed

19  him to tell Nee to move.

20         42.     Nee moved to the property line and continued taking photographs,

21  though his view at this point was obscured.  Nee waited for about thirty minutes to

22  speak to a supervisor about not being allowed to photograph while standing next to

23  others surrounding the incident.  When an officer Nee recognized as a supervisor

24  by his insignia walked by, Nee asked to speak to him.  As the supervisor stopped,

25  Nee explained that one of the deputies was preventing him from photographing the

26  _____

27  [11] Nee captured the incident from this point forward on video, which he
    subsequently posted at http://www.youtube.com/watch?v=IQfLXmVXguw.

28

11

1  incident from a public sidewalk.  The supervisor said, "Alright, alright," and

2  walked away from Nee.

3  **III.     Third Incident: Defendants' Unlawful Detention of Moore**

4         43.     On June 2, 2011, Moore was working on a story for the Long Beach

5  Post about an April 2011 statewide campaign called Distracted Driving Awareness

6  Month.  He left his Long Beach apartment to try to take pictures of drivers talking

7  or texting while driving to accompany his story.  Moore walked from his apartment

8  to a nearby busy intersection at Ocean Boulevard and Magnolia Avenue in Long

9  Beach, and began taking pictures of drivers as they stopped at the traffic light.  It

10  was early afternoon, and Moore was dressed in a T-shirt, shorts, and running shoes.

11         44.     Moore had been photographing for several minutes when a group of

12  several LASD deputies approached and asked him if he was taking pictures of the

13  courthouse.  Before Moore could answer fully, one of the deputies told him to step

14  away from the street.  The deputies took Moore's camera, while one told him to

15  put his hands behind his back. A deputy held Moore's hands behind him while

16  another one patted him down thoroughly, including grabbing hold of the keys in

17  his pocket and manipulating them, groping the area of his groin twice, pulling up

18  his T-shirt and checking the waistband of his pants.

19         45.     As they patted Moore down, the officers arranged themselves in a ring

20  around Moore, so he could not leave, and proceeded to question him.  Moore

21  counted eight officers surrounding him.

22         46.     One of the officers, whom Moore later identified as Sgt. Hill, asked

23  Moore again what he was doing.  When Moore said he was a reporter and

24  explained the story he was working on, Sgt. Hill asked what news publication he

25  worked for.

26         47.     After Moore had responded to the deputies' questions, he asked why

27  they had stopped him.  Sgt. Hill told Moore that he was across the street from the

28  Long Beach Superior Court.  Sgt. Hill told him that the courthouse was a "critical

facility" and that his apparent photography of the courthouse was "suspicious activity." When Moore asked if taking pictures of the courthouse was illegal, Sgt. Hill replied that it was not, but told Moore that if his deputies get a call about someone photographing the courthouse, they have to respond.

48.     At some point, Moore asked the deputy holding his camera to return it. The deputy responded that he wanted to see the photographs Moore had taken. Moore showed the deputies the snapshots of drivers he had taken on the screen on his digital camera. Moore believed from the officer's response and his demeanor that they would only return the camera if Moore showed them the pictures.

49.     The LASD deputies held Moore for about fifteen to twenty minutes. Before they allowed him to leave, one of the deputies demanded that Moore provide his name, address, phone number, driver's license number, name of the publication he worked for, and the publisher's name and contact information. The deputies eventually released Moore without issuing him any citation.

50.     Later that day, Moore called Sgt. Hill attempting to inquire further into his detention. Hill told him: "We were detaining you because of a suspicious circumstance to ascertain your intention." Sgt. Hill invited Moore to meet in person about the incident, which Moore did. At the meeting, Sgt. Hill told Moore that the investigation was related to terrorism and that "taking pictures of the courthouse does meet the standard for a pat-down search."

51.     Following the incident, the National Press Photographers Association ("NPPA") wrote to LASD on July 14, 2011, to express its concern about the conduct of the LASD officers. On about August 18, 2011, NPPA received a letter signed by Sheriff Baca stating that the incident had been investigated and defending the deputies' actions.

52.     Moore followed up with another interview with LASD Captain Steven M. Roller, who identified himself as "unit commander" officer over the Long Beach courthouse. Capt. Roller defended the deputies' decision to pat Moore

down.  Roller told Moore that courthouses were potential terrorist targets, so that taking pictures near a courthouse would be suspicious activity, and in investigating somebody taking pictures near a courthouse who is a "potential terrorist," deputies would be entitled to pat him down.  Capt. Roller said that if he had been on the scene, he would have patted Moore down.

**IV.    Fourth Incident: Defendants' First Unlawful Detention of Quentin**

53.    On December 31, 2009, at about 1:00 a.m., Quentin and another photographer were taking photographs of a large refinery from the corner of Wilmington Avenue and East 223rd Street in Carson, California.

54.    Both Quentin and the other photographer he was with that evening take pictures of industrial areas to sell through stock photo services.  By using long exposures and creative framing, Quentin creates dramatic and artistic depictions of industrial buildings.  To take pictures of industrial scenery at night, Quentin uses a large, professional-quality camera and takes pictures openly, using a tripod.

55.    While Quentin and his companion were photographing from a public sidewalk by the intersection, an LASD deputy pulled alongside them in her car and began yelling at them aggressively, saying they had no right to be there and could not take photographs.  They protested that they were on a public sidewalk and were violating no laws, and asked why she was telling them to leave, but the deputy continued, without explanation, to yell at them and to order them repeatedly to stop photographing and leave the area.

56.    Quentin and his companion complied with the deputy's orders and stopped photographing, then walked to a nearby diner and ate a late meal.  As they walked out of the diner to return to their car, they began photographing the refinery again.  The LASD deputy that had confronted them returned and again confronted them.  This time, she told them that it was suspicious that they were out photographing so late, and threatened to place them on the "no fly" list.

14

1    57.    After a few minutes, another LASD officer pulled up and began

2    speaking with Quentin and his companion.  The second officer took a calmer tone,

3    but told the two photographers that though he understood their frustrations, they

4    should not anger the first deputy any further and, given the late hour, should leave

5    the area.  The second officer told them that their behavior looked suspicious and

6    suggested that they might be affiliated with terrorists.  Quentin and the other

7    photographer again protested, politely but repeatedly, that they were breaking no

8    law.   But the second officer repeatedly told the two that they could not continue

9    photographing and had to leave the area.  Quentin and the other photographer

10   eventually complied, stopped taking photographs, and left.  The LASD deputies

11   did not issue either Quentin or his friend a citation.

12   **V.    Fifth Incident: Defendants' Second Unlawful Detention of Quentin**

13   58.    On January 21, 2011, an LASD deputy stopped Quentin when he was

14   photographing another refinery by himself at about 1:25 a.m.  The deputy

15   immediately ordered him to place his hands behind his back and held them there

16   while he patted him down thoroughly.  The deputy removed the contents of

17   Quentin's pockets and placed them on the hood of the LASD car.

18   59.    While the deputy searched Quentin, he began asking what Quentin

19   was doing there and why he was out so late.   Quentin cooperated, explaining that

20   he was taking photos.

21   60.    After searching Quentin, the deputy placed him in the back of the

22   LASD car and waited outside.  Before doing so, however, the deputy asked

23   Quentin if his camera was recording video and told him that he had to turn it off if

24   it was.

25   61.    Within a few minutes, about four more LASD officers had arrived in

26   at least two more cars.  The deputies took turns questioning Quentin in the back of

27   the LASD cruiser.  The deputies again asked what he was doing photographing the

28   refinery, and why he was photographing this refinery in particular. They also asked

1   Quentin what he did with the pictures he took and whether he was affiliated with

2   any terrorist organizations or a member of any street gang. They asked where he

3   lived, about his job, and where he had parked that night. They asked some

4   questions several times. After about forty-five minutes, the deputies released

5   Quentin from the car.

6          62.    After they released him, Quentin asked what would happen if he kept

7   taking pictures. They responded that they would take him to jail and let a judge

8   decide what to do with him. As a result, Quentin did not take any more

9   photographs. The deputies told him that they would give him a ride to his car.

10  When Quentin said he would walk because it was only a block away, the deputies

11  told him they had to give him a ride. The deputies did not issue Quentin a citation.

12         63.    As a result of these incidents, Quentin has suffered emotional distress

13  and has been reluctant to take photographs of industrial areas.

14  **VI.    Additional Incidents**

15         64.    The experiences of Plaintiffs Nee, Moore, and Quentin are not

16  isolated. In addition to the five incidents that have given rise to this litigation,

17  LASD has stopped and seized other photographers, as well as telling

18  photographers that they are not allowed to photograph public buildings from public

19  sidewalks or other places they are legally allowed to be.

20         65.    Ted Soqui is a well-known freelance photojournalist based in Los

21  Angeles, California, where he has worked for decades. On April 28, 2011, Soqui

22  was photographing the exterior of the Los Angeles County Men's Central Jail and

23  nearby bail bonds businesses for use in a <u>Los Angeles Weekly</u> story on deputy

24  abuses at the jail. Standing only on public sidewalks, he took photographs openly

25  in broad daylight.  As he was walking back to his car, an LASD squad car pulled

26  up to him, and a deputy got out and ordered him to come over. More deputies

27  arrived until a total of six deputies were present at his subsequent questioning.

28  Soqui told the deputies that he was taking pictures for a newspaper, but refused to

1  answer what the story was about.  At that moment, the lead deputy put his hand on

2  his gun, moved uncomfortably close to Soqui, and asked to search him.  Soqui

3  complied.  After deputies took Soqui's license and used it to run a warrant check,

4  the officers released him, telling him that his detention was a national security

5  issue.  They informed him that photography was not allowed on Bauchet Street, a

6  public street with sidewalks that run between Twin Towers Correctional Facility

7  and Los Angeles County Men's Central Jail.

8      66.    Doran Barons is a photographer, radio and broadcast engineer, and

9  radio host.  In about August 2008, Barons was awaiting the Metro Rail subway at

10  the North Hollywood Metro station in Hollywood, California.  While waiting, he

11  began taking photographs of lights and subway trains in the station, all the while

12  remaining on the station platform in areas accessible to the public, and otherwise

13  complying with MTA rules regarding photography.  Soon after he began taking

14  photos, an LASD deputy came up to him and ordered him to stop photographing,

15  telling Barons that photography was not permitted on MTA property.  Barons

16  responded that photography was lawful and allowed, but the deputy demanded that

17  Barons stop photographing and asked for his driver's license.  The deputy released

18  Barons without a citation.  Barons thereafter became reluctant to ride the Metro

19  Rail or to photograph in the Metro Rail station.

20      67.    In mid-September 2011, Catherine Dent was taking photographs of

21  the exterior and signage for Men's Central Jail from Bauchet Street for use in a

22  video project.  She had been photographing openly on the publicly accessible

23  sidewalk using a large, professional-quality SLR camera, when two LASD

24  deputies driving in the opposite direction made a U-turn and pulled their car onto

25  the sidewalk near her.  The two deputies got out and ordered Dent to come over to

26  them.  They asked her to show them her pictures, which she refused to do.  They

27  asked for her identification.  She told them it was in her car, which was parked in a

28  lot some distance away.  They told her to go get it.  She replied that she would

show it to them if they accompanied her to her car, then turned and walked toward her car. When she arrived at her car several minutes later, no LASD officers were in sight. Dent got into her car and began to drive toward the parking lot exit, when another LASD car pulled across the exit so as to block it and prevent her from leaving the lot. Dent had to stop her car to avoid hitting the deputies' car. Two deputies got out and approached Dent in the manner of a traffic stop and asked for her identification, which she produced. They circled her car and examined her license plate. They also asked her to show them the photographs she had taken, which she refused to do. They asked why she was taking photographs, and she replied it was for a school project. Upon further questioning, Dent told them it was for an extension school class in film and video production at UCLA. The deputies released her after about five minutes.

68.    On October 19, 2011, Plaintiff Nee was standing in the Wilshire/Normandie Metro station, outside the ticketed area, waiting for protestors from the Occupy LA movement to arrive, when LASD deputies standing nearby told him not to take pictures of them, and told him that photography was not permitted in the Metro station. Nee was not taking photographs at the time, but was holding his camera.

## VII.   LASD Training and Suspicious Activity Reporting

69.    The incidents described above paint a clear pattern of harassment of photographers at the hands of LASD. Upon information and belief, this custom stems from LASD policy and training providing that photography is, without more, a suspicious activity potentially indicative of terrorism. This policy and training predictably leads to the unconstitutional detention of individuals taking photographs in public spaces, and to the chilling of their First Amendment right to take photographs.

70.    Over the past several years, law enforcement agencies across the country have begun instituting programs to get officers to investigate and report

information that is perceived to be potentially related to national security.  To that end, with the encouragement of the U.S. Department of Homeland Security and Director of National Intelligence ("DNI"), many departments have instituted "suspicious activity reporting" programs.  These programs require that line officers be trained to identify and report certain kinds of activity (including noncriminal conduct) that may have potential counterterrorism value to their department's counterterrorism officers.  This information can then be used and potentially shared with other agencies through "fusion" centers.

71.     "Suspicious activity reporting" was initially developed by the Los Angeles Police Department ("LAPD") under their Special Order 11, which requires officers report as "suspicious activities" any number of different criminal and noncriminal activity, including when an individual "[t]akes pictures or video footage (with no apparent esthetic value, i.e. camera angles, security equipment, security personnel, traffic lights, building entrances, etc.)" and "[e]ngages in suspected pre-operational surveillance (uses binoculars or cameras, takes measurements, draws diagrams, etc.)."

72.     Based in part on Special Order 11 as a model, the DNI has issued standards for "suspicious activity reporting."[12]  These standards list as a "suspicious activity," among other things, "[t]aking pictures or video of facilities, buildings, or infrastructure in a manner that would arouse suspicion in a reasonable person."

73.     Likewise, the Federal Bureau of Investigation's ("FBI") descriptions of its eGuardian suspicious activity reporting system indicate that reportable

---

[12] *See, e.g.*, Information Sharing Environment, Functional Standard, Suspicious Activity Reporting, Version 1.5 (May 2009) ("Functional Standards"), *available at* http://nsi.ncirc.gov/documents/ISE-FS-200_ISE-SAR_Functional_Standard_V1_5_Issued_2009.pdf.

1  activities include "photography of key infrastructure facilities."[13]

2      74.    Building upon the foundation developed by LAPD and DNI, LASD

3  implemented an analogous suspicious activity reporting program.  LASD policy

4  5.09/490.10, titled "Notification Process for Potential Homeland Security

5  Activity," details the requirements of what it calls "Potential Homeland Security

6  Activity" ("PHSA"), specifically stating that "[t]he reporting of PHSA is also

7  known nationally as 'Suspicious Activity Reporting.'"  The policy emphasizes that

8  all LASD personnel understand PHSA reporting procedures.  It further states that

9  personnel should be advised that PHSA "may not rise to the level of a crime" and

10  "may not have a clear nexus to terrorism."

11      75.    As part of its PHSA program, LASD's Field Operations Directive 03-

12  03 (Apr. 23, 2003) establishes clearance code 709-"Possible Terrorism Related

13  Incident" to be employed by LASD personnel who respond to an incident related

14  to terrorist activities.  The first example listed of when such a code should be used

15  is "suspicious persons videotaping public transportation, government facilities or

16  local critical facilities."

17      76.    The actions of the LASD officers described above were not the

18  unauthorized acts of rogue officers.  To the contrary, the officers were acting

19  consistent with LASD policy and training.  The nature of "suspicious activity

20  reporting" programs, the existence of such a program at LASD, and the pattern and

21  practice by LASD personnel of detention, harassment and prohibition of

22  photographers (and validation of that conduct by superiors who investigate

23  complaints), demonstrate that LASD has adopted, through training or custom, a

24  policy of detaining and searching photographers who photograph what government

25  buildings, infrastructure, or anything officers perceive to be a potential terrorist

26

27  _____

28  [13] *See* http://www.fbi.gov/foia/privacy-impact-assessments/eguardian-threat.

target.  LASD effectively trains its officers that such photography is prohibited, or can be prohibited at the officers' discretion, even if the photographer is in a public place and violating no law or rule while photographing.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of the Fourth Amendment; 42 U.S.C. § 1983

### (Against All Defendants)

77.   Plaintiffs reallege and incorporate the foregoing paragraphs as if set forth herein.

78.   Defendants' actions described above violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution by subjecting Plaintiffs to unreasonable warrantless searches and seizures.

79.   The violation of Plaintiffs' Fourth Amendment rights occurred pursuant to a policy, custom, or practice, maintained by LASD and the County, of having LASD officers detain, search, and interrogate photographers who photograph in public places where photography is legal and where officers have no reasonable basis to believe the photographer is engaged in any criminal activity or is armed or dangerous.

80.   Defendants' conduct violated clearly established constitutional or other rights, of which Defendants knew, or of which reasonable public officials should have known, rendering Defendants liable to Plaintiffs under 42 U.S.C. § 1983.

81.   As a direct and proximate result of the unlawful actions of these Defendants, Plaintiffs have suffered emotional and economic harm.

82.   Plaintiffs all intend to continue photographing, but fear further detention and harassment by the LASD.  That fear prevents them from photographing as much as they would like or in places they would like.

## SECOND CLAIM FOR RELIEF

### Violation of the First Amendment; 42 U.S.C. § 1983

### (Against All Defendants)

83. Plaintiffs reallege and incorporate the foregoing paragraphs as if set forth herein.

84. Defendants' actions described herein violated Plaintiffs' rights under the First Amendment to the United States Constitution by prohibiting Plaintiffs from exercising their constitutional right to free speech and expression, as well as freedom of the press, and by retaliating against Plaintiffs for attempting to exercise those same rights.

85. The violation of Plaintiffs' First Amendment rights occurred pursuant to a policy, custom, or practice, maintained by LASD and the County, of having LASD officers prohibit photographers from photographing in public places where photography is lawful, and of retaliating against photographers who exercise their First Amendment rights to photograph in such places by detaining, searching, and interrogating them.

86. Defendants' conduct violated clearly established constitutional or other rights, of which Defendants knew, or of which reasonable public officials should have known, rendering Defendants liable to Plaintiff under 42 U.S.C. § 1983.

87. As a direct and proximate result of the unlawful actions of these Defendants, Plaintiffs have suffered significant emotional and economic harm.

88. Plaintiffs all intend to continue photographing in public, but fear further detention and harassment by the LASD. That fear prevents them from photographing as much as they would like or in places they would like.

## PRAYER FOR RELIEF

89. Plaintiffs therefore respectfully request that the Court enter a judgment including:

22

a.  A declaratory judgment that Defendants' actions as described herein violated the First and Fourth Amendments to the United States Constitution;

b.  To the extent the Court finds that Defendants' conduct were authorized by a policy or regulation, a declaratory judgment that those policies or regulations are unconstitutional under the First and Fourth Amendments to the United States Constitution;

c.  As to the County of Los Angeles and LASD, an injunction to prevent the unlawful detention, search, interrogation, and harassment of photographers solely based on the fact they are taking photographs, and to prevent LASD officers from prohibiting photography in public places where photography otherwise violates no law.

d.  As to all Defendants, compensatory and statutory damages for violation of the laws and Constitution of the United States and State of California, in an amount to be determined at trial;

e.  Reasonable attorneys' fees and costs; and

f.  Any other relief as may be just and proper.

Dated:   October 27, 2011

Respectfully Submitted,

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _____
        Peter Bibring

Attorneys for Plaintiffs

23

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dean D. Pregerson and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV11- 8899 DDP (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

---

Peter Bibring (SBN 223981)
ACLU Foundation of Southern California
1313 West Eighth Street, Los Angeles, CA  90017

(Additional counsel on Attachment)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWN NEE; GREGGORY MOORE; SHANE QUENTIN; and THE NATIONAL PHOTOGRAHERS' RIGHTS ORGANIZATION, <br> PLAINTIFF(S) <br> v. <br> COUNTY OF LOS ANGELES; <br> (Contnued on Attachment) <br><br> DEFENDANT(S). | CASE NUMBER <br><br> CV11-08899 DDP (JLGX) <br><br><br> **SUMMONS** |

TO:     DEFENDANT(S): COUNTY OF LOS ANGELES;   (Continued on Attachment)

A lawsuit has been filed against you.

Within   21   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, Peter Bibring _____, whose address is 1313 West Eighth Street, Los Angeles, CA  90017 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

OCT 2 7 2011

Dated: _____

Clerk, U.S. District Court

**JULIE PRADO**

By: _____
        Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

# ATTACHMENT TO SUMMONS

**Additional Plaintiff's Attorneys:**

L. Rachel Lerman (SBN 193080)
  rlerman@akingump.com
Felix Lebron (SBN 232984)
  flebron@akingump.com
Sarah Gettings (SBN 260436)
  sgettings@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, CA  90067

**Defendants continued:**

LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a municipal corporation; SERGEANT MAURICE HILL, in his individual capacity; DEPUTY RICHARD GYLIFIE, in his individual capacity; DEPUTY BAYES,  in his individual capacity; and DOES 1 through 10, inclusive

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Shawn Nee; Greggory Moore; Shane Quentin; and The National Photographers'
Rights Organization

**DEFENDANTS**
See Attachment

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Peter Bibring (SBN 223981), ACLU Foundation of Southern California, 90017,
Tel: (213) 977-9500
(See Attachment for additional counsel)

**Attorneys** (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

---

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No    ☒ **MONEY DEMANDED IN COMPLAINT: $** Unspecified

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
see attachment

---

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 190 Other Contract | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 195 Contract Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 196 Franchise | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | REAL PROPERTY | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☒ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 240 Torts to Land | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

CV11 08899

**FOR OFFICE USE ONLY:** Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)    CIVIL COVER SHEET    Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ Date October 27, 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

## ATTACHMENT TO CIVIL COVER SHEET

### I(a). Additional Plaintiff's Attorneys:

L. Rachel Lerman (SBN 193080)
  rlerman@akingump.com
Felix Lebron (SBN 232984)
  flebron@akingump.com
Sarah Gettings (SBN 260436)
  sgettings@akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067

### Defendants:

COUNTY OF LOS ANGELES; LOS ANGELES COUNTY SHERIFF'S
DEPARTMENT, a Municipal Corporation; SERGEANT MAURICE HILL, in his
individual capacity; DEPUTY RICHARD GYLIFIE, in his individual capacity;
DEPUTY BAYES, in his individual capacity; and DOES 1through 30, inclusive

### VI. Cause of Action:

Action under 42 U.S.C. § 1983 for unlawful search and seizure in violation of
Fourth Amendment and restriction on protected expression in violation of First
Amendment.